UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:14-CT-3321-BO

**Micheal Camp**,

    Plaintiff,

v.

**Dennis Daniels**, et al.,

    Defendants.

**Memorandum & Recommendation**

   This matter comes before the court on Defendants' Motion for Summary Judgment (D.E. 25). Plaintiff Micheal Camp filed a Response to the Motion for Summary Judgment (D.E. 31) along with a 38–page exhibit (D.E. 31-1),[1] and a Motion to Supplement and Respond to Defendants' Answer (DE 29). The issues have been briefed and the matter is ripe for a ruling.

   On December 19, 2014, Camp, a state inmate proceeding *pro se*, filed a Complaint under 42 U.S.C. § 1983 (D.E. 1), along with an exhibit showing his attempts to exhaust his claim (D.E. 1-1) and a motion to appoint counsel (D.E. 3). Camp alleged that Defendants violated his rights under the Eighth Amendment by denying his requests to be placed in protective custody despite their awareness of threats upon his safety by members of the Bloods Gang. *See* Compl., D.E. 1. He named Dennis Daniels, Correctional Administrator at Maury Correctional Institution ("Maury C.I." or "Maury"); Brad Fields, Unit Manager at Maury; and Robert Burgess, Jr., Housing Unit Manager at Maury, as defendants in their individual and official capacities. *Id.*

   On January 8, 2015, Camp filed a motion to amend his Complaint to add a claim that the Defendants violated his rights under the Fourteenth Amendment's Due Process Clause by

---

[1] This exhibit consists of 38 pages showing Camp's efforts to obtain protective custody at Maury.

placing him on Intensive Control ("ICON") status in retaliation for seeking protective custody. Am. Compl., D.E. 10. Camp seeks a declaratory judgment, injunctive relief, and monetary damages from the Defendants for the alleged violations of his constitutional rights. Compl., D.E. 1.

The action was referred to the undersigned United States Magistrate Judge for a preliminary review pursuant to 28 U.S.C. § 1915A. *See* 28 U.S.C. § 636(b)(1). On June 29, 2015, the undersigned Magistrate Judge entered a Memorandum and Recommendation ("M&R") allowing Camp's motion to amend, denying Camp's motion to appoint counsel, dismissing Camp's due process claim and allowing Camp's Eighth Amendment claim to proceed (D.E. 16). On August 18, 2015, the district court adopted the M&R (D.E. 18). On October 13, 2015, the court was notified of the death of defendant Rowe (D.E. 20).

On December 18, 2015, the Defendants answered the Complaint (D.E. 23). On February 18, 2016, Defendants filed a Motion for Summary Judgment (D.E. 25), accompanied by a memorandum in support of the motion (D.E. 26), a statement of material facts (D.E. 27), and an appendix consisting of affidavits by each defendant (D.E. 28-1, 28-2, 28-3). On February 18, 2016, Camp filed a Motion to Supplement and Respond to Defendants' Answer (D.E. 29), which the court construes as a Reply to the Answer. On March 14, 2016, Camp filed a response to the motion for summary judgment (D.E. 31).

## I. Background[2]

On September 13, 2013, officials transferred Camp from Scotland Correctional Institution ("Scotland C.I." or "Scotland") to Maury C.I. because Camp was fearful of the Bloods Gang who, he claimed, were threatening him there. *See* Compl. at 3, D.E. 1. Prior to his transfer, Case Manager Locklear approached Camp and asked him about a letter he had written expressing his fear of the Bloods. At that time, Camp was on ICON status at Scotland. Several of the Bloods overheard the conversation and thereafter began to call Camp a "snitch." Camp became fearful for his life. *See* Compl. Ex. at 3–4, D.E. 1-1.

In response to Camp's fear, Larry Dunston, a security threat specialist with the Department of Public Safety ("DPS"), proposed that Camp be moved to Maury. Camp was in favor of the move. *See* Daniels Aff. ¶ 8, D.E. 28-1).

When Camp arrived at Maury, Defendant Daniels met with Camp to discuss Camp's fears. Compl.¶ 8, D.E. 1. Camp explained how staff at Scotland C.I. had "mishandled a safety concern" of his, making it appear as if he had "snitched" while eight Bloods in the block listened in on the conversation. *Id.* Camp explained that since that time, the Bloods threatened to stab him if he returned to the general population. *Id.* Camp then requested to be placed in protective custody. However, at the time he arrived at Maury, Camp was on Close Custody[3] status until August 14, 2014. *See* Compl. Ex. 1 at 1, D.E. 1-1. Camp could not be transferred to medium

---

[2] Camp is presently confined at Piedmont Correctional Institution. *See* https://webapps.doc.state.nc.us/opi/viewoffender.do?method=view&offenderID=0063132&searchLastName=Camp&searchFirstName=Michael&listurl=pagelistoffendersearchresults&listpage=4 (last visited July 19, 2016)

[3] Close Custody is a housing level where inmates are under armed supervision, housed in separate cells, and subject to closer to supervision because they are an escape risk, have been convicted of a very serious crime, or their actions in prison have shown that they will not follow rules. *See* Daniels Aff. ¶ 9, D.E. 28-1.

3

custody until his Close Custody status expired. *Id.* Daniels therefore believed Camp would be safe at Maury, but told him that if he was threatened, he should contact staff immediately. Daniels Aff. ¶ 9, D.E. 28-1; *see also* Compl. ¶ 8, D.E. 1. Defendants believed that Camp was never in danger of serious physical injury from the Bloods because of the increased security provided by his levels of confinement. *See* Daniels Aff. ¶ 27, D.E. 28-1; Fields Aff. ¶ 5, D.E. 28-2; Burgess Aff. ¶ 11, D.E. 28-3

Approximately one month after arriving at Maury, on October 28, 2013, Camp attempted to file a grievance complaining that he did not feel safe being housed with so many Bloods and not knowing if he was going to be attacked. Apparently his grievance was never processed. Compl. ¶ 10, D.E. 1. On November 19, 2013, Camp filed another grievance alleging the same facts. *Id.*

**A.     Camp's November 19, 2013 Grievance**

In Camp's November 19, 2013 grievance (Compl. Ex. at 1–6, D.E. 1-1), he recounted the incident at Scotland C.I. involving Case Manager Locklear. Camp stated that, although he was in a different facility, he was concerned about "word travel[ing]" from Scotland and that he had caught Bloods "staring at [him] often or whispering amongst each other." Therefore, he did not feel that the move to Maury assured his safety. Compl. Ex. at 3–4, D.E. 1-1.

Camp was also concerned about what would happen to him "when someone from Scotland arrives here at Maury with the 'hit' info on [Camp]." Camp stated, "[t]here are too many Bloods here for me to know who to watch out for so yes I still feel unsafe cause [sic] I know a lot of the Bloods here are down with those at Scotland." *Id.* at 5. Camp requested to be placed in protective custody. *Id.* at 6. However, Camp did not allege that he had been threatened by the Bloods at Maury.

4

Defendant Daniels denied the grievance because Camp, who had been released from ICON status on August 14, 2013, was on Close Custody status until August 14, 2014. Daniels Aff. ¶ 9. Daniels noted that Camp had not indicated any safety problems to staff and he was participating in recreation and other activities. Daniels advised Camp to seek assistance from the nearest staff member if he received a threat. Compl. Ex. at 1, D.E. 1-1. Camp appealed the denial to the Inmate Grievance Resolution Board with no success. Compl. Ex. at 2, D.E. 1-1.

**B.     Camp's June 10, 2014 Grievance**

On March 15, 2014, Camp received his first threat from the Bloods at Maury. On that date, during outside recreation, Camp was spotted by two Bloods from Scotland who were housed on ICON. They called him a "snitch" and "began . . . telling other Bloods that he was on the hit list." Compl. ¶ 12.

On March 18, 2014 through June 9, 2014, Camp continued to make inquiries, asking to be placed in protective custody. Compl. ¶¶ 13–20. He complained that there had been no investigation of the situation. Compl. ¶ 16.

On June 10, 2014, he filed his second grievance complaining that staff had "failed to address [his] concerns" and that he was "being threatened again." Compl. ¶ 21; Compl. Ex. at 14–15, D.E. 1-1. He asked to be placed in an undisclosed medium custody facility and requested an investigation. *Id.* at 14. Camp complained that "instead of addressing [his] concerns of being unsafe," prison staff was punishing him and sending him to ICON. *Id.* at 15. This complaint occurred prior to the expiration of his Close Custody status. *See* Compl. Ex. at 1, D.E. 1-1.

On June 18 2014, Assistant Unit Manager Robert Burgess, Jr. conducted a Controlled Investigation to determine whether protective custody was appropriate for Camp. Daniels Aff. ¶ 18, D.E. 28-1. A Controlled Investigation is an investigation concerning allegations involving

5

threats to inmates, inmate criminal activity, inmate abuse, and similar matters. Burgess Aff. ¶ 4, D.E. 28-3. During the investigation, Burgess interviewed Camp. Camp was able to give him the nicknames or street names of inmates he alleged had threatened him, but did not know the inmates' real names. Daniels Aff. ¶ 18. However, Camp was willing to point out the inmates to Burgess or to identify them in photographs. *See* Compl. Ex. at 11, D.E. 1-1; Pl.'s Reply to Answer ¶ 1, D.E. 29.

In connection with the investigation, Burgess interviewed Officer J. Roberts, the Security Threat Group Investigator at Maury, whose responsibilities included investigating the activities of Security Threat Group members, such as members of the Bloods. Burgess asked Officer Roberts if he had heard or received any information that the Bloods were threatening Camp. Roberts had not. Based on his investigation, Burgess recommended that Camp not be placed on protective custody. Burgess Aff. ¶ 10, D.E. 28-3. Camp's grievance was denied (Compl. Ex. at 16, D.E. 1-1) and he remained in Disciplinary Segregation and/or Intensive Control until he was transferred from Maury[4] (Burgess Aff. ¶ 11).

---

[4] From January 29 2014, until February 7, 2014, Camp was placed on Administrative Segregation ("Aseg") for facility violations. Daniels Aff. ¶ 12. On February 7, 2014, Camp was found guilty of tampering with a lock and stealing property and was given 15 days in Disciplinary Segregation ("Dseg"). Camp was in Dseg from February 7 until February 10, 2014. From February 13, 2014 until March 3, 2014, Camp was placed on Aseg while staff investigated allegations of facility violations. Daniels Aff. ¶ 14. On March 3, 2014, Camp was found guilty of possessing a cell phone and was given forty-five days of Dseg time. On March 12, 2014, he was found guilty of use of profane language and was given thirty days of Dseg time. Camp was in Dseg from March 3, 2014 until May 15, 2014. Daniels Aff. ¶ 15. From May 15, 2014 until July 3, 2014, Camp was on Aseg. Daniels Aff. ¶ 16. On July 16, 2014, Camp was found guilty of lock tampering for the second time, threatening to harm or injure a staff member and disobeying an order. He was given sixty days in Dseg. Daniels Aff. ¶ 21.

### C. Camp's July 21, 2014 Grievance

Camp continued to make inquiries about his request for protective custody. Compl. ¶¶ 22–29. On July 21, 2014, Camp filed a third grievance, again stating that he was being threatened by the Bloods and requesting again to be placed in protective custody.[5] *See* Compl. Ex. at 7–13, D.E. 1-1. He stated that he saw two Bloods from Scotland C.I. that he did not know were at Maury and that they threatened that he would be stabbed, cut or assaulted if he returned to population. *Id*. at 7. He stated, there is "no telling how many more Bloods have shipped in from Scotland who know about the 'hit' on [him]." *Id.* at 8. He alleged that staff "deliberately refuse[s] [him] a safe haven and are instead continuing to expose [his] identity to more and more Bloods." *Id.* at 10. He complained that his extensive time in segregation was "punishment" for requesting to be safe. *See id.* at 8–9, D.E. 1-1.

In response to Camp's grievance, officials initially recommended another investigation. *See* Compl. Ex. at 12, D.E. 1-1. However, on review, Daniels rejected the recommendation because Camp was already on ICON and would not have been eligible for protective custody until he came off ICON. Additionally, Daniels felt that the first protective custody investigation adequately and appropriately addressed the issue. Daniels Aff. ¶ 23; Compl. Ex. at 12, D.E. 1-1. Daniels denied Camp's July 21, 2014 grievance and his decision was upheld by the Inmate Grievance Resolution Board. Compl. Ex. at 13, D.E. 1-1.

On December 19, 2014, Camp filed this lawsuit.

---

[5] On July 18, 2014, Camp was placed back on ICON status due to his repeated facility violations and remained on ICON status until his transfer to Mountain View Correctional Institution on April 24, 2015. Daniels Aff. ¶ 22.

7

## II.     Standard of Review

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, *Anderson*, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis removed) (quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. *Anderson*, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## III.    The Eighth Amendment Duty to Protect

The Eighth Amendment, made applicable to the states through the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishment by government officials. U.S. Const. amend. VIII. "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (citations omitted). "To constitute cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety …. [O]bduracy and wantonness, not inadvertence ... characterize the conduct prohibited by [the Eighth Amendment]." *Whitley v. Albers*, 475 U.S. 312, 319 (1986);

*see also Moore v. Winebrenner*, 927 F.2d 1312, 1316 (4th Cir. 1991). The Supreme Court has summarized deliberate indifference as follows:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.

*Farmer*, 511 U.S. at 837. The Supreme Court "expressly has repudiated a negligence standard for Eighth Amendment claims." *Moore*, 927 F.2d at 1316.

The Eighth Amendment's Cruel and Unusual Punishments Clause imposes on prison officials "a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833. Officials must take "reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984). "The government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833. Nonetheless, "[t]he burden is on the prisoner to demonstrate that prison officials violated the Eighth Amendment, and that burden is a heavy one." *Pyles v. Fahim*, 771 F.3d 403, 408–09 (7th Cir. 2014) (citing *Whitley*, 475 U.S. at 325).

In order to state a claim for damages against a prison official for failure to protect from inmate violence, an inmate must plead facts that show (1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm. *Farmer*, 511 U.S. at 833–37. "Deliberate indifference" in this context is a subjective standard in that the prison official must actually have known or been aware of the excessive risk to inmate safety. *Id.* at 835–37. "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to

9

the risk, even if the harm ultimately was not averted." *Id.* at 844. "Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable" on a failure to protect claim. *Id.* at 845.

## IV. Discussion

The court first addresses Camp's requests for injunctive and declaratory relief. *See* Compl. at 15, D.E. 1. These requests are moot because Camp is no longer confined at Maury. *See Rendelman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009) ("[A]s a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there."). Thus, the Defendants are entitled to summary judgment on Camp's claims for declaratory and injunctive relief.

As for Camp's Eighth Amendment claim, in order to establish a claim for failure to protect, Camp must show that the Defendants "k[new] of and disregard[ed] an excessive risk" to Camp's safety. *See Farmer*, 511 U.S. at 837. Camp has failed to meet this burden.

The court first notes that Camp has not alleged that during the time he was at Maury C.I. he suffered an attack or attempted attack by the Bloods. Thus, the court questions whether the absence of an attempted attack, together with Camp's segregated confinement status while at Maury, negates the excessive risk to Camp's safety to which the Defendants might be deliberately indifferent. Assuming that such a risk existed, Camp relies on evidence of his discussions with the Defendants, his grievances, and his almost-daily requests for protective custody to show that the Defendants were aware of the threats to his safety made by the Bloods. He also points to his belief that multiple stabbings occurred at Maury's modified housing while he was there.

10

Defendants acknowledge that Camp apprised them of the threats and his fears, however the evidence shows that the Defendants believed in the security of the prison facility and believed that Camp was safe given his various custody levels while at Maury. From March 15, 2014, when Camp reported his first threat from the Bloods, until Camp was transferred to Mountain View Correctional Institution, he was either on Aseg, Dseg, or ICON where he was housed in his own cell and separated from general population inmates. *See* Daniels Aff. ¶ 27. It is clear that Camp's concern was about being returned to the general population. *See* Compl. ¶¶ 8, 13, 15, 21, 27, 36. Under those circumstances, Defendants' belief that Camp's segregated confinement would ensure his safety was reasonable. *See Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (reasoning that single–cell housing is the "approximate equivalent" of protective custody). Moreover, prisoners have no right under the Constitution to be held in either protective or minimum custody. *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983); *O'Bar v. Pinion*, 953 F.2d 74, 83 (4th Cir. 1991).

Notwithstanding Camp's secure confinement away from the general population, officials continued to take steps to allay his fears. While at Scotland C.I., Camp was on ICON status where inmates are kept in separate cells and not permitted out of their cells without close supervision from prison security staff. Still, the decision was made to transfer Camp to Maury in order to assuage his fears and to move him away from the Bloods who had threatened him.

Upon his arrival at Maury in September 2013, Daniels met with Camp in order to discuss and address Camp's concerns. At that time, Camp requested protective custody. However, due to Camp's Close Custody status, Camp would not be eligible for medium custody until August 2014, almost a year later. But, in response to Camp's continued concerns, the Defendants conducted a Controlled Investigation which failed to reveal evidence of threats by members of

11

the Bloods against Camp. The Defendants' actions in response to Camp's concerns were reasonably designed to keep Camp safe and fall far short of establishing a "deliberate indifference" to a substantial risk of serious harm.

Camp has failed to rebut the evidence establishing that the Defendants' response to his concerns was a reasonable one. He alleges that staff referred to him as a "snitch," thus inciting the inmates. *See* Pl.'s Resp. to Mot. Sum. J. at 2–3, D.E. 31. This allegation is unsupported and Camp does not connect this allegation to any named Defendant. If true, the allegation is reprehensible, but is unrelated to the reasonableness of Defendants' response to the risk to Camp's safety. The court has reviewed the case upon which Camp relies, *Flint ex rel. Flint v. Kentucky Dept. of Corrections*, 270 F.3d 340 (6th Cir. 2001), where an inmate was murdered, and finds it to be inapplicable to Camp's circumstances.

Camp further argues that while segregation did limit inmate-to-inmate contact it is not as safe as protective custody and that there were gang-related assaults at Maury. Pl.'s Resp. to Mot. Sum. J. at 4, D.E. 31. However, prisoners have no constitutional right to be held in protective custody. *See Adams*, 40 F.3d at 75; *Hewitt*, 459 U.S. at 468; *O'Bar*, 953 F.2d at 83.

Defendants' response to Camp's complaints falls far from establishing the "obduracy and wantonness" prohibited by the Eighth Amendment. *Whitley v. Albers*, 475 U.S. at 319. Camp provides no support for his conclusory allegation that the Defendants "lied" when they stated an investigation was conducted. *See* Pl.'s Resp. to Mot. Sum. J. at 3, D.E. 31. Finally, Camp's conclusory claim that he was placed in segregated confinement in retaliation for seeking protective custody is unsupported factually, and, in any event, does not state a claim for relief under 42 U.S.C. § 1983. *See Adams*, F.3d at 75. In short, Camp has failed to establish that the Defendants were deliberately indifferent to his safety, and this action should be dismissed.

### V. Conclusion

The undersigned grants Camp's Motion to Respond to Defendants' Answer (D.E. 29) and construes the motion as a Reply to Defendants' Answer. The undersigned recommends that the court grant Defendants' Motion for Summary Judgment (D.E. 25).

Furthermore, the court directs that the Clerk of Court serve a copy of this Memorandum and Recommendation on plaintiff. Plaintiff shall have until 14 days after service of the Memorandum and Recommendation on plaintiff to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a *de novo* determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(l); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If plaintiff does not file written objections to the Memorandum and Recommendation by the foregoing deadline, plaintiff will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, plaintiff's failure to file written objections by the foregoing deadline will bar plaintiff from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Wright v. Collins***, 766 F.2d 841, 846–47 (4th Cir. 1985).**

Dated: August 2, 2016

_____
ROBERT T. NUMBERS, II
UNITED STATES MAGISTRATE JUDGE